IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| BRIDGIT CHRISTENSEN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF DECATUR, GEORGIA, | : | CIVIL ACTION NO. |
| ANDREA ARNOLD, in her individual | : | 1:20-cv-4318-AT |
| and official capacities, and CONNIE | : | |
| JACOBS-WALTON, in her individual | : | |
| capacity, | : | |
| | : | |
| Defendants. | : | |

## ORDER

Presently before the Court are Defendants' Motions to Dismiss the Second Amended Complaint ("SAC"). [Docs. 71, 72, 73, 74]. As discussed below, the Motions filed by Defendants Connie Jacobs-Walton, Andrea Arnold, Chet Burge, Patricia Garrett, Panos Kanes, and Meredith Roark, [Docs. 71, 72, 74], are **GRANTED** and they are **DISMISSED** from this case. The City of Decatur's Motion, [Doc. 73], is **GRANTED IN PART AND DENIED IN PART**. Counts 4, 5, and 6 against the City of Decatur are **DISMISSED**. Counts 1, 2, 3, 9, 10, 11, 12, 13, and 14 against the City of Decatur will proceed.

## I.   Background

Plaintiff Lt. Bridget Christensen is a gay female firefighter who began working for the City of Decatur in August 2000. (SAC, Doc. 66 ¶ 34). During her more than 19 years of service, she received numerous awards and honors for her dedication and excellence. *See* (*id.* ¶ 35).

As a condition of her employment, Plaintiff was required to participate in Decatur's Amended and Restated Defined Benefit Retirement Plan (the "Plan"). (2013 Plan, Doc. 66-1 at 10). Plaintiff has been contributing to the Plan since her hiring and has been fully vested since 2010. (Doc. 66 ¶¶ 37–38).

Decatur established its first retirement plan in 1947. (2013 Plan, Doc. 66-1 at i). Since then, the Plan has been amended from time to time. (*Id.*). Effective January 1, 1997, Decatur adopted an Amended and Restated Defined Benefit Retirement Plan, which was in effect at the time Plaintiff began working for Decatur. (Doc. 66 ¶ 3). The Plan was again restated in 2013, and except for a few limited amendments, the terms that existed in the 2013 Plan are still in effect. *See* (*id.* ¶ 4).

### A.   The 2013 Plan

The Plan is administered by the Retirement Board of Trustees for the City of Decatur (the "Board" or "Retirement Board"), and it recognizes the Board and Decatur as the retirement plan's fiduciaries. (Doc. 66-1 at 46). The Plan dictates when Decatur employees are entitled to retire and how the employees' retirement benefits are calculated under the Plan.

Under the 2013 Plan, the normal retirement age for a Decatur public safety employee was the later of age 60 or the employee's age upon completion of 10 years of vesting service. (*Id.* at 4). But a Decatur public safety employee was also permitted to retire early and receive a disability benefit upon a finding by the Board that the employee was disabled. (*Id.* at 17).

A public safety employee could receive a disability benefit under the 2013 Plan if the Board determined that he or she incurred a disability "either as a result of his/her [e]mployment (regardless of his/her age and length of service), or after he/she has reached age 50 and completed 10 Years of Vesting Service." (*Id.*). The Board considered a public service employee "totally and permanently disabled" if the employee was "wholly prevented, by a physical and/or mental condition, from performing the usual duties of his/her job in a safe and efficient manner, and that such condition [was] reasonably expected to result in death or to be of long continued and indefinite duration." (*Id.*). In determining whether an employee had incurred a disability, "the Board [could] rely on the examination and opinion of licensed physicians, and on such medical and other evidence as the Board considers appropriate." (*Id.*).

The 2013 Plan provided the following Claims Procedure for employees who wished to apply for retirement and/or disability benefits:

> 9.4 **Claims Procedure.** All Participants and beneficiaries must submit their applications or benefits to the Board. Upon receipt of an application, the Board will determine all facts necessary to establish the claimant's right to benefits and the amount of any benefits due under the Plan. Upon request, the Board will provide the claimant the

> right to a hearing with respect to any finding of fact or determination of eligibility. Unless a claimant has timely exhausted the administrative remedies described in this Section 9.4, he/she will not have standing to file a lawsuit based on the Board's denial of his/her claim. After a claimant has exhausted his/her administrative remedies, he/she may file a lawsuit based on the claim denial within 180 days after the date the Board issues its final written claim denial decision. No legal action may be commenced or maintained later than 180 days after the Board issues its final written claim denial decision.

(*Id*. at 50). To calculate a public service employee's monthly disability benefits under the 2013 Plan, a percentage of the employee's final average earnings[1] was multiplied by the number of years of service the employee would have earned if the employee had continued to work until his or her normal retirement date. (*Id*. at 12, 18).

Critically, the terms of the Plan are not set in stone. Decatur "reserves the right to amend the Plan from time to time." (*Id*. at 44). At its discretion, the Board may draft an amendment, triggering the following enactment procedure:

> Each amendment must be approved by a majority of the Board members present at a Board meeting with a quorum, and by a majority of the City Commissioners. The City Commissioners then in office will adopt each amendment by placing their signatures thereon.

---

[1] "Final Average Earnings" is defined as the "Participant's average monthly Compensation for the 60-consecutive-whole-calendar-month period during the Participant's Employment which yields the highest average. If a Participant does not have 60 consecutive months of Employment but has 60 non-consecutive months, the Board will use the average of his/her Compensation for the final 60 months of actual Employment. If a Participant does not have 60 months of actual Employment, the Board will use the average of his/her Compensation for the actual months of Employment." (Doc. 66-1 at 5).

(*Id.*). Thus, while the Board initiates and has the first vote in the amendment process, the City Commissioners have the final say as to whether an amendment is enacted. *See* (*id.*); (Doc. 66 ¶ 197).

The Plan notes that the rights of employees "who terminate[] employment before the effective dates of the various [amendments] . . . will be determined under the provisions in effect on the date the employee terminate[s] employment, except as otherwise required by applicable law." (Doc. 66-1 at iv).[2]

### B.   Plaintiff is Injured and the Plan's Claims Procedures Are Amended

In December 2016, Plaintiff was injured in the line of duty while riding in a firetruck. (*Id.* ¶ 48). Due to her injury, she filed a claim for workers' compensation. (*Id.* ¶ 49). Although Plaintiff attempted to continue performing light-duty work, she ultimately received a spinal fusion surgery. (*Id.* ¶ 50).

At some point in September 2018, Plaintiff's orthopedic surgeon drafted a letter to Decatur indicating that due to her injury, Plaintiff should only work light duty for the foreseeable future. (Doc. 66 ¶ 51).

On September 1, 2018, Decatur's 2013 Retirement Plan was amended to revise the "Claims Procedures" by which employees apply for retirement and/or disability benefits. *See* (2018 Plan, Doc. 66-2 at iv). Under the new procedures,

---

[2] This language has changed slightly in recent years. *See* (2020 Plan, Doc. 66-2 at v) (stating that the rights of retired employees "who terminate[] employment before the effective dates of the various amended provisions set forth in this document will be determined under the provisions in effect on the date the employee terminate[s] employment, except as otherwise *provided in the amendment* or as required by applicable law") (emphasis added).

applications would no longer be submitted directly to, and exclusively processed by, the Board. Instead, they provided:

9.4 **Claims Procedure.** All Participants and Beneficiaries must submit their applications for benefits to the City's Director of Human Resources.

(a) **Initial Determination of Eligibility.** Upon receipt of an application, the Director of Human Resources will compile information, data, and documentation needed to determine whether the claimant is eligible for benefits. If the Director of Human Resources determines that the claimant is eligible, he/she will compile all data required to determine the amount of benefits due (including an actuarial benefit calculation), the form of payment due, and the payment beginning date.

(b) **Trustees' Review of Determination.** The Director of Human Resources will email to all Trustees a copy of the pension application, related information such as the Participant service and compensation data and actuarial calculation, and the Director of Human Resources' recommendation of approval or denial.

(c) **Trustees' Input.** Any Trustee who has a question, additional information, or input about any application, must describe it in an email to the Director of Human Resources. The Director of Human Resources will consider any such information that relates to a relevant Plan provision or relevant data, in determining whether to approve or deny the application.

(d) **Limits of Director of Human Resources' Authority.** The Director of Human Resources will have authority to approve or deny any application except (1) his/her own application; and (2) any application from an individual in a supervisory position over the Director of Human Resources. Pension applications for the Director of Human Resources and any individual in a supervisory position over the Director of Human Resources must be submitted to the Director of Human Resources, but will only be approved or disapproved by the Board of Trustees at a meeting.

(e) **Notice to Applicant.** Within a reasonable period of time not to exceed fourteen (14) days, the Director of Human Resources will provide written notice to the applicant by email and/or U.S. mail, whether the application has been approved or denied.

(f) **Implementation of Approved Application.** If the application is approved, the Director of Human Resources will arrange for the commencement of pension payments as of the appropriate date requested by the claimant, or if later, the earliest date permitted by the Plan.

(g) **Contents of Denial Letter.** If the application is denied, the written notice will include the reason(s) for the denial, the relevant Plan provisions, and a copy of this Section 9.4 Claims Procedure.

(h) **Delivery of Notices to Trustees.** The Director of Human Resources will provide a copy of the written notice of approval or denial by email to all Trustees.

(i) **Ratification or Disapproval by Trustees.** At the next Board of Trustees meeting, the Trustees will ratify or disapprove, by majority vote, all applications approved or denied since the most recent Board meeting.

(j) **Hearing of Challenge to Denial.** Upon request, the Board will provide the claimant the right to a hearing with respect to any finding of fact or determination of eligibility.

(k) **Mandatory Exhaustion of Administrative Remedies and Deadline to File Lawsuit.** Unless a claimant has timely exhausted the administrative remedies described in this Section 9.4, including a request for a hearing, he/she will not have standing to file a lawsuit based on the denial of any part of his/her claim. After a claimant has exhausted his/her administrative remedies described in this Section 9.4, he/she may file a lawsuit based on the claim denial within 180 days after the date the Board issues its final written claim denial decision. No legal action may be commenced or maintained later than 180 days after the Board issues its final written claim denial decision.

(Doc. 66-2 at 57–59).[3]

In short, upon receipt of an employee's application, the HR Director makes an initial determination of the applicant's eligibility for retirement and/or disability benefits and, if the applicant is eligible, she calculates their monthly retirement payment amount. *See* (*id.*). The Board then (1) provides feedback on the HR Director's Initial Determination of Eligibility; (2) ratifies or rejects the HR Director's approval or denial of an application, including the benefit calculation; and (3) conducts a hearing during which an applicant can challenge the final determination. *See* (*id.*).

### C.   Plaintiff Begins Considering Retirement

In March 2019, Decatur proposed settling Plaintiff's workers' compensation case by allowing her to retire with "total and permanent disability" under the Plan instead of continuing to work light duty while receiving workers' compensation payments. (Doc. 66 ¶ 58). At the time, Plaintiff was already precluded from doing her job due to her December 2016 injury, and Decatur requested that Plaintiff obtain a letter from her doctor explaining how her disability related to her job description. (*Id.*).

---

[3] The stated purpose of these amended procedures was to "facilitate the City's more timely processing of Pension applications" and "to begin the pension payments as expeditiously as possible." (Doc. 66-2 at iv).

### D.    Retirement Board Approves the 2019 Amendment

On April 15, 2019, the Retirement Board held a meeting during which its members reviewed a proposed amendment to the Plan's disability benefits. (*Id.* ¶ 100). The amendment would substantially reduce the disability benefits for any Decatur employee who, like Plaintiff, retired before the normal retirement age due to a "non-catastrophic injury." *See* (*id.* ¶ 76–77, 80). Only employees with "catastrophic" disabilities would still qualify for the Plan's full Total and Permanent Disability benefits. (*Id.*). A "catastrophic" disability was defined as an injury or illness that totally and permanently disabled an employee from "ever performing *any* gainful employment"—not merely the usual duties of the employee's job. *See* (Doc. 66 ¶¶ 72, 94); (Doc. 66-1 at 92) (emphasis added).

Decatur's benefits attorney, Helen Cleveland, told the Board that the purpose of the 2019 Amendment was to remedy the "inconsistencies" between Decatur's Total and Permanent Disability Benefit and (1) the Internal Revenue Code's "definition of disability for retirement plan distributions" and (2) the gratuities clause of the Georgia Constitution. *See* (*id.* ¶¶ 66, 87–88, 92, 94, 102). Cleveland therefore stated that the 2019 Amendment would need to be applied retroactively, which may require a recalculation of prior retiree's disability benefits. *See* (*id.* ¶¶ 163–64).

Plaintiff alleges that Decatur "had no good faith basis in fact or law" to conclude that these inconsistencies existed, much less that they required the 2019 Amendment. *See* (*id.* ¶ 102). Instead, this justification was "fraudulent and

fabricated to prevent City employees, and specifically Lt. Christensen, from retiring with disability." (*Id.* ¶ 104). She claims that Decatur pursued the 2019 Amendment because it "did not want to pay what it owed to disabled employees." (*Id.*).

### E.  Plaintiff Begins Retirement Application Process

On May 9, 2019, Plaintiff obtained an appointment with her orthopedic surgeon. (Doc. 66 ¶ 60). The surgeon wrote a letter to Decatur stating that in his medical opinion, with or without spinal fusion surgery, Plaintiff was "permanently precluded from performing the usual duties of [her] job in a safe and efficient manner," and she would "not be able to return to this line of work." (*Id.*).

On May 10, 2019, Plaintiff began Family Medical Leave Act ("FMLA") leave after her wife gave birth to triplets. (*Id.* ¶ 61). Days later, Plaintiff requested a calculation of what her monthly retirement benefits would be if she agreed to retire with "total and permanent disability" benefits.[4] (*Id.* ¶ 62).

After "unreturned calls and receiving the run around," Plaintiff emailed Decatur HR Director Connie Jacobs-Walton on May 29, 2019, requesting an in-person meeting. (*Id.* ¶ 63). Two hours later, Plaintiff and other public safety employees received an email from firefighter and Retirement Board member, Bernard Tarplin, informing them that the Board had voted to amend the disability

---

[4] The SAC does not identify to whom Plaintiff sent her request.

provisions of the Plan.[5] *See* (*id.* ¶¶ 66, 70). This amendment would proceed to the City Commission for final approval. *See* (Doc. 66-1 at 44).

The next day, Plaintiff met with Jacobs-Walton to request a calculation of her monthly retirement benefits. (Doc. 66 ¶ 64–65). Jacobs-Walton told Plaintiff that she would need to submit a formal written request to retire with "Total and Permanent Disability" before the calculation could be made. (*Id.* ¶ 64). Jacobs-Walton added that Plaintiff would need to "request a [retirement] date several weeks in the future." (*Id.* ¶ 65).[6]

During the meeting, Plaintiff asked Jacobs-Walton about Tarplin's May 29 email. (*Id.* ¶ 67). Jacobs-Walton stated that she did not know anything about the proposed amendment to Decatur's retirement plan. (*Id.*). When Plaintiff remarked that she was glad that the proposed amendment would not affect her, Jacobs-Walton looked at Plaintiff, remained silent, and walked away. (*Id.* ¶ 68).

---

[5] The SAC indicates that Plaintiff—and perhaps numerous other Decatur public safety employees—first learned of the 2019 Amendment's proposed disability benefit changes from Tarplin's May 29, 2019 email. *See* (Doc. 66 at ¶ 66).

[6] Section 9.4(f) states if the employee's retirement "application is approved, the Director of Human Resources will arrange for the commencement of pension payments as of the appropriate date requested by the claimant, or if later, the earliest date permitted by the Plan. (Doc. 66-2 at 58). Section 1.16 of the Plan defines "Disability Retirement Date" as "the first day of the month on or next following the date the Board determines a Participant has incurred a Disability." (Doc. 66-1 at 4); (Doc. 66-2 at 4). Section 3.5(c) further explains, "A Participant who incurs a Disability as a result of performing the duties of his/her Employment, regardless of such Participant's age or Years of Vesting Service, will be retired on the first day of the month on or next following the date the Board determines that he/she has a Disability and that it resulted from Employment. His/her Disability benefit payments will begin as of that date." (Doc. 66-1 at 18); (Doc. 66-2 at 22).

Shortly after the meeting, at 11:20 AM, Plaintiff sent Tarplin's May 29 email to Jacobs-Walton. (*Id.* ¶ 69). Jacobs-Walton forwarded the email to City Manager and Retirement Board member Andrea Arnold. (*Id.* ¶¶ 16, 70). Jacobs-Walton stated that Tarplin had not informed her that he was sending the email and voiced her opinion that the email "exceeded [Tarplin's] authority as a Board Member." *See* (*id.* ¶¶ 16, 70). Jacobs-Walton asked Arnold what she "wanted to do about it," and upon information and belief, Plaintiff alleges that Tarplin was reprimanded for the email. (*Id.* ¶¶ 70–71).

That evening, at 7:55 PM, Plaintiff emailed Jacobs-Walton that she intended to retire with "total and permanent disability" and attached her orthopedic surgeon's letter. (*Id.* ¶¶ 73–74). "[S]olely pursuant to Ms. Jacobs-Walton's instructions," Plaintiff stated that her "first day of retirement would be July 1, 2019." (Doc. 66 ¶ 73).

The next morning—Friday, May 31—Jacobs-Walton responded to Plaintiff's email, "Received. I will forward the retirement application to you shortly." (*Id.* ¶ 50). At 6:18 PM on Monday, June 3, Jacobs-Walton sent Plaintiff a "Retiree Package" to complete. (*Id.* ¶ 51).

### F. City Commission Votes to Enact the 2019 Amendment

Sometime after her meeting with Plaintiff on May 30, 2019, Jacobs-Walton emailed City Manager Arnold a memorandum outlining the 2019 Amendment, describing the purported reasons for it, and recommending that the City Commission enact it through an attached draft ordinance. (*Id.* ¶ 72).

At 7:30 PM on June 3, 2019, Jacobs-Walton attended a City Commissioners meeting to explain the purpose and the effect of the 2019 Amendment. (*Id.* ¶ 78). The Commissioners voted to enact the 2019 Amendment, effective that day. (*Id.* ¶¶ 76, 79).

Although the Plan amendment procedures state that "[t]he City Commissioners then in office will adopt each amendment by placing their signatures thereon," the City Commissioners did not *all* place their signatures on the ordinance enacting the 2019 Amendment. *See* (Doc. 66 ¶ 86); (Doc. 66-1 at 44, 96). Instead, the ordinance was signed on behalf of the "Decatur City Commission" by only one Commissioner—Mayor Patricia Garrett. *See* (Doc. 66-1 at 90–96).[7] The City Commissioners never all placed their signatures on any document memorializing the 2019 Amendment. (Doc. 66 ¶ 86).

### G. Plaintiff Submits and Quickly Withdraws Her Retirement Application

On June 5, 2019, Plaintiff submitted her retirement application to Jacobs-Walton. (Doc. 66 ¶¶ 106, 154). Eight days later, on June 14, Plaintiff emailed Jacobs-Walton to follow up on the status of her application.[8] (*Id.* ¶ 118). Later that day, Plaintiff went to Jacobs-Walton's office to ask for a calculation of her monthly retirement benefit. (*Id.* ¶ 63). Jacobs-Walton responded by handing Plaintiff a

---

[7] Decatur City Clerk and Retirement Board Member Meredith Roark also signed the ordinance as attestation. *See* (Doc. 66-1 at 96).

[8] Under the Plan's Claims Procedures, the HR Director has 14 days to notify the applicant whether her application had been approved or denied. (Doc. 66-2 at 58).

spreadsheet showing that her benefits would be $405.51 per month. (*Id.* ¶ 119). Plaintiff was surprised, as she believes that she would have received $4,784.74 per month before the 2019 Amendment. *See* (Doc. 66 ¶¶ 108–117, 120, 122). Due to this low calculation, Plaintiff withdrew her request to retire on June 17, 2019. (*Id.* ¶ 124).

### H. After Withdrawing Her Retirement Application, Plaintiff Continues Requesting That Her Benefits Not Be Calculated under the 2019 Amendment

On June 19 and July 22, 2019, Plaintiff emailed Jacobs-Walton requesting a meeting to discuss the low calculation of her benefits. (*Id.* ¶ 130).

On August 9, 2019, Plaintiff met with Jacobs-Walton (Decatur's HR Director), Arnold (Decatur City Manager and Retirement Board Member), and Meredith Roark (Decatur City Clerk and Retirement Board Member). (*Id.* ¶ 131). Although Plaintiff had withdrawn her retirement application, she asked for a reevaluation of her monthly benefit calculation. (*Id.*). Arnold and Jacobs-Walton responded that Decatur would not reevaluate her calculated monthly benefit. (*Id.*) When Plaintiff then asked if the Retirement Board could review the calculations, Arnold, Roark, and Jacobs-Walton said nothing. (*Id.* ¶ 132). "Jacobs-Walton unequivocally stated that the Plan had been amended and that it was not possible for Plaintiff's calculation to be changed." (*Id.*).

In September 2019, Plaintiff received her spinal fusion surgery. (*Id.* ¶ 133). She took FMLA leave and returned to work in November 2019. (*Id.* ¶ 131). Upon returning from FMLA leave, Plaintiff sought to teach EMS and CPR part time, but

she alleges that the City refused to provide proof that she was affiliated with the City of Decatur Fire Department.  (*Id.* ¶ 137). As a result, she lost her CPR and EMS instructor certifications at the end of 2019. (*Id.*).

On January 8, 2020, Plaintiff again met with Arnold and Jacobs-Walton to ask whether Decatur would reconsider the calculation of her monthly retirement benefits. (*Id.* ¶ 140). When Arnold told her no, Plaintiff reiterated her request to go directly before the Board to discuss the calculations. (*Id.* ¶ 141). Arnold and Jacobs-Walton explained that had "never been done," and that the Board could not make an exception for Plaintiff.[9] (*Id.*). Arnold added that that Decatur's retirement plan "was never meant to be a disability plan. That's what Workers' Comp is for."[10] (*Id.* ¶ 142).

The SAC does not reflect that Plaintiff spoke to Jacobs-Walton again. Jacobs-Walton was fired by Decatur after a February 2020 internal investigation revealed that she had made a series of homophobic remarks about gay employees during her tenure as HR Director. *See* (*id.* ¶¶ 11, 54); (Feb. 2020 Report, Doc. 66-3).

---

[9] Indeed, the Claim Procedures in Section 9.4 of the Plan only provide for a hearing before the Board to challenge a final benefits determination. *See* (Doc. 66-2 at 58–59). Here, Plaintiff alleges that she withdrew her retirement application before even an Initial Determination of Eligibility was made. The SAC identifies no Plan provision that allowed an employee in Plaintiff's position—especially with no active retirement application pending—to appear before the Board.

[10] The Court notes this remark's inconsistency with Decatur's prior proposal to settle Plaintiff's workers' compensation case by allowing her to retire with total and permanent disability benefits under the Plan. *See* (Doc. 66 ¶ 58).

## I.      The Supposed Retroactivity of the 2019 Amendment

The Plan was restated in 2020 to incorporate the 2019 Amendment. (Doc. 66 ¶¶ 92, 173). The 2020 Plan states that 2019 Amendment's changes to disability benefits were effective on June 3, 2019, "for *all disability retirement benefits currently in pay status* and all disability claims that had been or could have been submitted on that date, and all disability claims submitted on or after that date." (*Id.* ¶ 173) (emphasis added). In April 2020, Decatur's counsel likewise represented to Plaintiff, "Notwithstanding any initial difference in the calculation of benefits between those who retired prior to June 2019 and those who retired after the new Ordinance, it is important to note that *all retirement plan participants who are currently drawing benefits are now subject to the terms of the new Ordinance and are subject to having their benefits and eligibility recalculated accordingly.*" (*Id.* ¶ 172) (emphasis original).

Despite this, Plaintiff alleges that she remains the only Decatur employee who has had her benefits reduced under the 2019 Amendment. (Doc. 66 ¶ 175). She further alleges that Decatur has not applied the 2019 Amendment to any similarly situated male or heterosexual firefighters. (*Id.*). This includes Jamie Crow, a male, heterosexual firefighter with the same job duties as Plaintiff, who was permitted to retire in 2018 with full Total and Permanent Disability benefits after he suffered a spinal injury. *See* (*id.* ¶ 167–70). Crow testified in September 2022 that he was still receiving monthly Total and Permanent Disability retirement benefits of $4,462.67. (*Id.* ¶ 170).

### J.    Plaintiff Files EEOC Charge & This Lawsuit

In March 2020, Plaintiff filed a Charge of sex discrimination with the EEOC. (Doc. 66 ¶ 30). Seven months later, she initiated this lawsuit, (Doc. 1), and soon after, the EEOC provided her notice of her right to sue, (Doc. 66 ¶ 30).

Plaintiff filed her First Amended Complaint ("FAC") in May 2021, (Doc. 35), and Defendants timely moved to dismiss, (Docs. 37, 38). The Court determined that because Plaintiff withdrew her 2019 retirement application before receiving a final decision from the Retirement Board, she failed to exhaust her administrative remedies under the Plan, and the Court could not review her claims. *See* (Doc. 35 at 30–36). The Court held in abeyance Defendants Motions to Dismiss, stayed further proceedings, and ordered the case administratively closed until Plaintiff completed the Plan's Claims Procedure. *See* (*id*. at 37–38).

### K.    Plaintiff's 2022 Retirement Application & Koehler Resolution

On April 15, 2022, Plaintiff submitted a new application for disability retirement benefits. (Doc. 66 ¶¶ 31, 146). She stated that she was "renewing" her withdrawn June 5, 2019 application and requested that her benefits be paid "retroactively," beginning on June 1, 2019, while being calculated under the Plan's pre-2019 formula.[11] *See* (Doc. 66 ¶¶ 31, 146, 149). At the Board's request, Plaintiff

---

[11] Despite her allegations to the contrary, Plaintiff has yet to identify a Plan provision that can be construed to confer her a "right" to renew her 2019 application. *See* (*id*. ¶¶ 265, 267).

agreed to delay the application adjudication proceedings so she could provide an updated medical evaluation. *See* (*id.* ¶ 149).

During the delay, the Retirement Board—as the body empowered to interpret the terms of the Plan—was asked by Decatur's HR Director to determine whether Plaintiff could "renew" her withdrawn June 2019 application. *See* (Doc. 66 ¶¶ 150, 153, 272); (Doc. 66-2 at 54); (Koehler Resolution, Doc. 66-4). Plaintiff alleges that counsel for the Board, Philip Koehler, "disparaged [her] to the Board and stated that [her] effort to have her retirement benefits begin retroactively on June 1, 2019, was 'a form of double dipping,' as Lt. Christensen had been receiving workers' compensation payments since that time." (Doc. 66 ¶ 55). She also alleges that he incorrectly told the Board that she submitted her 2019 application on improper forms, did not accurately complete the application, and "did not sign or date anything" on the application. (*Id.* ¶ 152).

On May 20, 2022, the Retirement Board passed a resolution (the "Koehler Resolution") providing the following interpretation of the Plan:

> 1. The term "application" set forth in Section 9 .4( a) of the Plan means an eligible Participant's claim for benefits under the Plan as in effect on the date the applicant submits the application to the Director of Human Resources (the "Director") set forth in writing on a form prescribed by the Board or the Director, which form has been fully and accurately completed and signed and dated by the applicant on the date it is submitted to the Director.
>
> 2. The Plan shall be administered such that an application for benefits accepted by the Director that is voluntarily withdrawn by the applicant at a later time constitutes the applicant's complete abandonment of the underlying claim or claims for benefits in such application on the date it was withdrawn.

3. The Plan shall be administered such that a voluntarily withdrawn application constitutes a legal nullity as of the date of the applicant's withdrawal and does not enter into or remain for any purpose in a pending, inactive, holding or any other status under the Plan after that date.

4. The Plan shall be administered such that a subsequent application by an applicant who voluntarily withdrew a prior application shall be regarded for all purposes under the Plan as an application for the commencement of benefits determined under the Plan as in effect on the date the applicant submitted the subsequent application to the Director. Any language in said subsequent application that refers to or relies upon the date of the withdrawn application for any purpose under the Plan shall be ignored and regarded as non-responsive to any information requested by the form prescribed by the Board or the Director or for any administrative function under the Plan.

(Doc. 66-4 at 2–3). Under these interpretations of the Plan, (1) Plaintiff was unable to renew her 2019 application, (2) her 2022 application would be evaluated under the current terms of the Plan, and (3) she could not receive "retroactive" benefit payments. Although the Koehler Resolution states that it was passed in response to requests made by Plaintiff's 2022 retirement application, its interpretations of the Plan are binding on all other retirement applications. *See* (*id.* at 1–3).

## L.    Disposition of Plaintiff's 2022 Application

On June 2, 2022, Decatur's new HR Director, Tracy Carter, notified Plaintiff that she had made an initial determination to approve her application but, under the 2019 Amendment's disability benefits formula, her monthly payment was $844.74. *See* (*id.*). On July 15, 2022, the Retirement Board ratified Carter's determination. *See* (*id.*). Because Plaintiff's monthly payment was significantly lower than the $4,784.74 that she requested under the pre-2019 formula, Plaintiff appealed the determination to the Retirement Board. *See* (*id.*). In September 2022,

19

Plaintiff and her counsel had a hearing before the Board, after which the parties submitted post-hearing briefs. *See* (*id.*). In November 2022, the Retirement Board unanimously voted to affirm the benefits calculation of $844.74 per month and issued its final Statement of Decision. *See* (*id.*) (citing Doc. 51-1).

## II.    Second Amended Complaint

Plaintiff moved to reopen this case on November 23, 2022, (Doc. 51), and in September 2023, she was permitted to file her Second Amended Complaint ("SAC"). [Doc. 66]. The SAC brings 14 claims against the City of Decatur, former Decatur HR Director Connie Jacobs-Walton, City Manager and Retirement Board Member Andrea Arnold, and Retirement Board members Patricia Garrett, Meredith Roark, Panos Kanes, and Chet Burge:

- **Count 1:** Breach of Contract against the City of Decatur;

- **Count 2:** Violation of the Impairment Clause of the Georgia Constitution, Ga. Const. art. I, § 1, ¶ X, against the City of Decatur;

- **Count 3:** Violation of the Contracts Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 1, against the City of Decatur;

- **Count 4:** Fraud and Deceit against the City of Decatur and Jacobs-Walton in her individual capacity;

- **Count 5:** Breach of Fiduciary Duty against the City of Decatur and Arnold, Garrett, Roark, Kanes, and Burge in their individual capacity;

- **Count 6:** Negligent Misrepresentation against the City of Decatur and Jacobs-Walton in her individual capacity;

- **Count 7:** Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, under 42 U.S.C. § 1983, against Arnold and Jacobs-Walton in their individual capacities;

- **Count 8:** Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, under 42 U.S.C. § 1983, against Jacobs-Walton, Arnold, Garrett, Roark, Kanes, and Burge in their individual capacities;

- **Count 9:** Retaliation in violation of the Family Medical Leave Act, 29 U.S.C. §§ 2601–54, against the City of Decatur;

- **Count 10:** Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against the City of Decatur;

- **Count 11:** Retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against the City of Decatur;

- **Count 12:** First Amendment Retaliation, under 42 U.S.C. § 1983, against the City of Decatur and Garrett, Roark, Kanes, and Burge in the individual capacities;

- **Count 13:** Retaliation in violation of the Georgia Whistleblower Protection Act, O.C.G.A. § 45-1-4, against the City of Decatur; and

- **Count 14:** Declaratory Judgment Request, under 28 U.S.C. § 2201, finding that the City of Decatur and its City Commissioners never validly adopted the June 3, 2019 Amendment to Decatur's Retirement Plan.

*See* (Doc. 66 ¶¶ 177–294). Plaintiffs timely moved to dismiss these claims,[12] [Docs. 71, 72, 73, 74], and this review followed.

---

[12] The City of Decatur did not move to dismiss Counts 1, 9, and 10 against it. *See* [Doc. 73-1].

### III.   Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007); Fed. R. Civ. P. 12(b)(6). The plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555); Fed. R. Civ. P. 8(a). In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is not required to provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Id.* at 556. A complaint may survive a motion to dismiss for failure to state a claim even if it is "improbable" that a plaintiff would be able to prove those facts and even if the possibility of recovery is extremely "remote and unlikely." *Id.*

**IV.   Discussion**

   **A.   Impairing Contract Obligations in Violation of the Georgia Constitution (Count 2) and United States Constitution (Count 3)**

Counts 2 and 3 of the SAC respectively allege that the City violated the Impairment Clause of the Georgia Constitution and the Contract Clause of the United States Constitution when the City Commissioners adopted the 2019 Amendment, which resulted in a decrease in Plaintiff's benefit payments. (Doc. 66 ¶¶ 188–201).

The Impairment Clause of the Georgia Constitution states: "No bill of attainder, ex post facto law, retroactive law, or laws impairing the obligation of contract or making irrevocable grant of special privileges or immunities shall be passed." *City of Waycross v. Bennett*, 849 S.E.2d 33, 36 (Ga. Ct. App. 2020) (quoting Ga. Const. art. I, § 1, ¶ X). The provision mirrors the United States Constitution's Contract Clause, which likewise provides: "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility." U.S. Const. art. I, § 10, cl. 1.

Decatur moves to dismiss Counts 2 and 3 of the SAC "as duplicative of the Breach of Contract claim" in Count 1. *See* [Doc. 73-1 at 7]. But the two cases that it cites to support its argument undermine its request. In neither case did the Georgia Supreme Court or the Georgia Court of Appeals dismiss constitutional contract impairment claims as duplicative of breach of contract claims. *See Borders v. City of Atlanta*, 779 S.E.2d 279 (Ga. 2015); *Bennett*, 849 S.E.2d 33. They instead

23

analyzed the claims side by side after explaining that Georgia courts subject breach of contract claims and constitutional contract impairment claims "to the same analysis" because both "rais[e] breach of contract issues." *See Bennett*, 849 S.E.2d at 35–36 (quoting *Borders*, 779 S.E.2d at 282). Thus, the Court denies Decatur's request to dismiss Counts 2 and 3.

### B. State Law Fraud (Count 4), Breach of Fiduciary Duty (Count 5), and Negligent Misrepresentation (Count 6)

#### 1. City of Decatur

Decatur moves to dismiss the state-law tort claims against it in Counts 4, 5, and 6 on sovereign immunity grounds. [Doc. 73-1 at 8–9]. Plaintiff responds that Decatur waived its immunity through the purchase of liability insurance. *See* (Doc. 85 at 8–9).

Municipal corporations like Decatur are entitled to sovereign immunity under Georgia law. *Malone v. Johnson*, 667 F. Supp. 3d 1257, 1275 (N.D. Ga. 2023). The Georgia Constitution recognizes municipal immunity and "explicitly requires an act of the General Assembly—a statute—to define any waivers of that immunity." *Sharma v. City of Alpharetta*, 865 S.E.2d 287, 290–91 (Ga. Ct. App. 2021) (citing Ga. Const., Art. IX, § II, ¶ IX). Relevant here, the General Assembly has declared that "[a] city can waive its sovereign immunity by purchasing liability insurance if the 'policy of insurance issued covers an occurrence for which the defense of sovereign immunity is available, and then only to the extent of the limits of such insurance policy.'" *Gray v. Ector*, 541 F. App'x 920, 926 (11th Cir. 2013)

(quoting O.C.G.A. § 36–33–1(a)); *Malone*, 667 F.3d at 1275; *Sharma*, 865 S.E.2d at 290.

As the party seeking to benefit from Decatur's waiver of sovereign immunity, Plaintiff bears the burden of establishing that the waiver occurred. *See Atlanta Metro Leasing, Inc. v. City of Atlanta*, 791, 839 S.E.2d 278, 285 (Ga. Ct. App. 2020); *Scott v. City of Valdosta,* 634 S.E.2d 472, 476 (Ga. Ct. App. 2006). At the motion-to-dismiss stage, this means that Plaintiff must have plausibly alleged such a waiver in her Complaint. *See Malone*, 667 F. Supp. 3d at 1275–76 (holding that by "sufficiently plead[ing] the existence of an insurance policy that waive[d] the City's immunity," plaintiff "carried his initial burden to show a waiver" at the motion-to-dismiss stage); *Gebru v. City of Atlanta*, 2014 WL 3024224, at *7 (N.D. Ga. July 2, 2014) (dismissing plaintiff's state-law claims because his complaint failed to allege that defendant waived sovereign immunity).

Yet the SAC does not allege that Decatur waived its sovereign immunity in any way—much less by purchasing liability insurance covering this conduct. *See* (Doc. 66). Instead, Plaintiff first raised this waiver argument in her Response Brief. *See* (Doc. 85 at 9). Because Plaintiff did not sufficiently plead a waiver of Decatur's sovereign immunity as to her state-law tort claims, Counts 4, 5, and 6 against Decatur are dismissed. *See Malone*, 667 F. Supp. 3d at 1276; *Gebru*, 2014 WL 3024224, at *7.

### 2.   **Individual Defendants**

Jacobs-Walton, Arnold, Garrett, Roark, Kanes, and Burge move to dismiss the state-law tort claims against them in Counts 4, 5, and 6. They argue that they are entitled to official immunity from these claims brought against them in their individual capacity.

#### a.  *Georgia's Official Immunity Doctrine*

"The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity" under state law. *Grammens v. Dollar*, 697 S.E.2d 775, 777 (Ga. 2010) (quoting *Cameron v. Lang*, 549 S.E.2d 341, 344 (Ga. 2001)). "The issue of a government employee's official immunity must . . . be resolved as the threshold issue in a suit against the employee in his personal capacity." *Roberson v. McIntosh Cnty. Sch. Dist.*, 755 S.E.2d 304, 306–07 (Ga. Ct. App. 2014) (citing *Cameron*, 549 S.E.2d at 343). "Unlike qualified immunity under federal law, we must inquire into [the employee's] subjective intent to determine whether he has official immunity under Georgia law." *Jordan v. Mosley*, 487 F.3d 1350, 1357 (11th Cir. 2007).

"Individual government employees are shielded by official immunity from damages suits unless the plaintiff can establish that the official negligently performed a ministerial act or performed a discretionary act with malice or an intent to injure." *Williams v. Fulton Cnty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1142 (N.D. Ga. 2016) (citing *Grammens*, 697 S.E.2d at 777). "A ministerial act is

commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Grammens*, 697 S.E.2d at 777. Whereas a discretionary act "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id.*

"Whether the act of a public official is ministerial or discretionary is determined by the facts relevant to the official act or omission from which liability is alleged to arise." *Roberson*, 755 S.E.2d at 307 (citing *Grammens*, 697 S.E.2d at 777); *see Williams*, 181 F. Supp. 3d at 1143. "Where there is an established policy requiring an official to take specified action in a specified situation, the policy creates a ministerial duty on the part of the official to perform the specified task." *Grammens*, 697 S.E.2d at 777. Georgia courts have therefore held that "an action is ministerial only if [the relevant government entity] creates policy requiring certain actions under certain situations." *Roberson*, 755 S.E.2d at 307 (quoting *Whitfield v. Brown*, 734 S.E.2d 98, 100 (Ga. Ct. App. 2012)).

### b. Analysis

Here, Jacobs-Walton, Arnold, Garrett, Roark, Kanes, and Burge argue that they are entitled to official immunity on these counts because their alleged actions were discretionary acts and because the SAC does not plausibly allege that they acted with actual malice. *See* [Doc. 71 at 23–25]; [Doc. 72-1 at 11–12]; [Doc. 74-1 at 9–11]. In opposing defendants' motions, Plaintiff does not dispute that they were

engaged in discretionary actions,[13] but she counters that the SAC sufficiently alleges that each plaintiff acted with actual malice. *See* (Doc. 83 at 18–20); (Doc. 84 at 6–8). The Court disagrees.

"Actual malice is a demanding standard: it requires an [official] to act with 'a deliberate intention to do a wrongful act.'" *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016) (citing *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999)). "A 'deliberate intention to do wrong' . . . must be the intent to cause the harm suffered by the plaintiffs." *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007). It is "not merely an intent to do the act purportedly resulting in the claimed injury." *Wyno v. Lowndes Cnty.*, 824 S.E.2d 297, 304 (Ga. 2019) (citation omitted). "Actual malice requires more than 'harboring bad feelings' or 'ill will' about another; rather, ill will must also be combined with the intent to do something wrongful or illegal." *Id.*; *Croland v. City of Atlanta*, 782 F. App'x 753, 759 (11th Cir. 2019).

Nowhere does the SAC allege that any of these individual defendants acted with "actual malice." Nor do Counts 5 and 6 otherwise allege that the defendants

---

[13] Where a plaintiff declines to respond to an argument raised in a defendant's motion to dismiss, that point is conceded. *See, e.g., Georgia Atlas, Inc. v. Turnage*, 594 F. Supp. 3d 1339, 1347 (N.D. Ga. 2022); *Lambeth v. Three Lakes Corp.*, 478 F. Supp. 3d 1347, 1354 & n.7 (N.D. Ga. 2020); *see also Barnes v. AstraZeneca Pharms. LP*, 253 F. Supp. 3d 1168, 1171 (N.D. Ga. 2017) ("It is the duty of the parties and not that of this Court to formulate arguments in opposition to reasonable motions . . . ."). Even if Plaintiff did not concede that defendants' alleged conduct were discretionary acts, the allegations in the SAC compel such a conclusion, as the SAC fails to allege the existence of any "established policies" that dictate what actions defendants were required to take in the specified situations. *See Grammens*, 697 S.E.2d at 777; *Roberson*, 755 S.E.2d at 307–08.

acted with the intent to cause the alleged harm suffered by Plaintiff through unlawful action. And while Count 4 alleges that Jacobs-Walton acted "with the intent to deceive and injure Plaintiff by denying her 91.5% of her retirement benefits," (Doc. 66 ¶ 206), this allegation is conclusory and does not claim that Jacobs-Walton intended to act unlawfully.

Thus, official immunity shields Jacobs-Walton, Arnold, Garrett, Roark, Kanes, and Burge from personal liability for Plaintiff's state-law tort claims, and Counts 4, 5, and 6 against them are dismissed.

### C.    Equal Protection Clause Violation (Count 7)

Count 7 alleges that Arnold and Jacobs-Walton, acting in their individual capacities, violated Plaintiff's equal protection rights under the Fourteenth Amendment in three ways. First, by "eliminating pension benefits for retirees who are disabled, including firefighters and police officers who were disabled due to their service to the City, while simultaneously not eliminating the pension benefits of retirees who are not disabled." (Doc. 66 ¶ 228). Second, by "eliminating [Plaintiff's] pension benefits, while simultaneously not eliminating the pension benefits of her male, heterosexual comparators who are similarly situated in all material respects." (*Id.* ¶ 230). And third, by "retaliating against Plaintiff for exercising her statutory rights to complain about unlawful discrimination when she filed her Charge of Discrimination with the EEOC on March 11, 2020." (*Id.* ¶ 232).

Arnold and Jacob-Walton moved to dismiss this claim on several grounds. Regarding Plaintiff's retaliation theory, they argue that that this component of Plaintiff's claim does not state a legally cognizable claim and should be dismissed because the Eleventh Circuit has repeatedly held that "no clearly established right exists under the *equal protection* clause to be free from retaliation." *Ratliff v. DeKalb Cnty., Ga.*, 62 F.3d 338, 340 (11th Cir. 1995) (emphasis original).[14] Instead, "[t]he right to be free from retaliation is clearly established as a *first amendment* right and as a *statutory* right under Title VII." *Id.* (emphasis original). Plaintiff concedes this point and does not oppose the dismissal of the retaliation component of her equal protection claim. *See* (Doc. 83 at 2 n.1; Doc. 84 at 2 n.1). Accordingly, it is dismissed.

Next, Arnold and Jacobs-Walton argue that the rest of Count 7 should be dismissed because it does not sufficiently allege that they were final decisionmakers regarding Plaintiff's pension benefits. [Doc. 71 at 5 -9]; [Doc. 72-1 at 15–17]. The Court agrees.

A § 1983 claim may only hold a Government official individually liable for his or her own misconduct. *See Iqbal*, 556 U.S. at 677. Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676; *C.C. ex rel. Andrews v. Monroe*

---

[14] *See also, e.g., Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1328 (11th Cir. 2023); *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997); *West v. City of Albany, Georgia*, 830 F. App'x 588, 594 (11th Cir. 2020).

*Cnty. Bd. of Educ.*, 427 F. App'x 781, 783 (11th Cir. 2011); *Melinda v. DeKalb Cnty. Sch. Dist.*, 2009 WL 10699686, at \*7 (N.D. Ga. Oct. 13, 2009); *Carter v. Howard*, 2023 WL 5668021, at \*14 (N.D. Ga. June 6, 2023), *report and recommendation adopted*, 2023 WL 5668029 (N.D. Ga. July 28, 2023).

To be held individually liable for a discriminatory employment decision under § 1983, the defendant must generally be a government "decisionmaker" who "has the power to make official decisions." *See McCarthy v. City of Cordele, Georgia*, 111 F.4th 1141, 1147 (11th Cir. 2024) (citing *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003); *Kamensky v. Dean*, 148 F. App'x 878, 879 (11th Cir. 2005). "[A]n official or formal decision-maker may often be identified by a rule, e.g., an employee handbook or organizational chart, or in the case of public entity employers, by examining the statutory authority of the official alleged to have made the decision." *Quinn*, 330 F.3d at 1328; *Gilroy v. Baldwin*, 843 F. App'x 194, 196 (11th Cir. 2021). At bottom, a defendant is a decisionmaker subject to individual liability when she has the power to *effectuate* the relevant employment decision, not merely to *recommend* it. *See Quinn*, 330 F.3d at 1328; *Gilroy v*, 843 F. App'x at 196; *Kamensky*, 148 F. App'x at 879.

Here, neither Count 7 nor any other portion of the SAC explicitly allege—or provide the factual allegations to reasonably infer—that Arnold or Jacobs-Walton were a final decisionmaker with the power to unilaterally "eliminate" or reduce

Plaintiff's pension or the pension of any other city employee.[15] And more fundamentally, neither Count 7 nor any other portion of the SAC identify *any* decision made by either of these two defendants that unilaterally reduced Plaintiff's pension benefits.[16] *See* (Doc. 66 ¶¶ 10, 227–31). Instead, Count 7 merely incorporates the allegations in paragraphs 1–176 before vaguely alleging that Arnold and Jacobs-Walton "eliminat[ed]" Plaintiff's pension benefits based on her sex or disability, in violation of the Fourteenth Amendment's Equal Protection Clause. *See* (*id.*).

This "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements" does not identify the conduct that forms the basis of this claim and cannot ultimately plead a viable cause of action. *See Iqbal*, 556 U.S. at 678; *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013).[17] Because the SAC fails to plausibly allege that Arnold and Jacobs-Walton are individually liable for violating Plaintiff's equal protection rights, the rest of Count 7 must be dismissed. *See Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court

---

[15] In contrast, the SAC does allege that the City Commissioners were collectively the "final decisionmakers for amending the Plan" when it was amended in 2019, and that the Retirement Board members were collectively the "final decisionmakers" for interpreting the Plan when they adopted the Koehler Resolution in 2022. *See* (Doc. 66 ¶¶ 197, 272).

[16] To the contrary, Plaintiff's response briefs argue that "the City and its agents," including Jacobs-Walton and Arnold, "*acted jointly* in eliminating Plaintiff's vested disability retirement benefits." *See* (Doc. 83 at 10; Doc. 84 at 19) (emphasis added).

[17] As discussed in section III.D, *infra*, this style of pleading also may arguably run afoul of the requirements of Federal Rule of Civil Procedure 10(b).

to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

### D.   Due Process Clause Violation (Count 8)

Count 8's allegations are also cursory. After incorporating the allegations in paragraphs 1–176 it summarily alleges:

> Defendants Jacobs-Walton, Arnold, Garrett, Roark, Kanes, and Burge, acting in their individual capacities, have subjected, caused to be subjected, and continue to subject Plaintiff to deprivation of the right to due process, as secured by the Fourteenth Amendment to the U.S. Constitution, by way of eliminating her vested property rights to her pension benefits without providing her notice, some kind of hearing, or a decision by a neutral decision maker—prior to the deprivation of those rights.

(Doc. 66 ¶ 236). Understandably, defendants first move to dismiss this claim as inadequately pled because—despite pursuing individual liability against all six of these defendants—it "makes no attempt to parse actions attributable to any particular Defendant." [Doc. 72-1 at 18–19]; [Doc. 74-1 at 12]. As with Count 7, this is a problem.

To start, the Eleventh Circuit has cautioned plaintiffs that it is a "sin" under Federal Rule of Civil Procedure 10(b) to assert claims against multiple defendants without adequately specifying which defendants are responsible for which wrongful acts. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Similarly, a count incorporating by reference the entirely of a complaint's lengthy factual allegations section without advising as to what allegations are relevant requires readers to wade through a sea of allegations that are immaterial to that specific count to try locate those that are. *See Magluta v.*

*Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001). Pleading in this way hinders a district court's ability to complete the "difficult, but essential, task of attempting to narrow and define the issues from the earliest stages of the litigation," *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997), and fails "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323.

It also prevents the plaintiff from sufficiently pleading a claim under Rule 12(b)(6). Here, because a § 1983 claim may only hold a government official individually liable for his or her own misconduct, a plaintiff must plead how *each* government-official defendant violated the law by his or her own actions. *See Iqbal*, 556 U.S. at 677. More specifically, it must allege that the defendant's action "deprived her of a federal or constitutional right and that the person was acting under color of law." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

Since not all actions by state or local employees are acts under color of law, "[t]he dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual." *Edwards*, 49 F.3d at 1523. To survive a motion to dismiss, a § 1983 claim must therefore plausibly allege that the relevant acts by each government-official defendant "deprive[d] the plaintiff of a right through the exercise of authority that [the official] has by virtue of her government office or position." *See Butler v.*

*Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012); *Walker v. Dixon*, 840 F. App'x 397, 400–01 (11th Cir. 2020).

Here, Count 8 requires the Court to speculate as to which of these six defendants' acts, as alleged somewhere in paragraphs 1–176, deprived Plaintiff of her due process rights and whether those acts were under color of law. The claim's general allegation that the defendants "have subjected, caused to be subjected, and continue to subject Plaintiff to deprivation of the right to due process . . . by way of eliminating her vested property rights to her pension benefits," (Doc. 66 ¶ 236), is little help, as it constitutes "labels and conclusions, and a formulaic recitation of the elements" of this cause of action. *See Twombly*, 550 U.S. at 555. In effect, Count 8 asks the Court to speculate as to Plaintiff's legal theory and supporting allegations rather than directing it to the facts that allow the Court to "draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

Accordingly, Count 8 does not plausibly allege that these defendants violated Plaintiff's due process rights and must be dismissed.

### E.   Title VII Retaliation (Count 11)

Count 11 alleges that Decatur retaliated against Plaintiff for her March 2020 EEOC Charge when the Retirement Board passed the May 2022 Koehler Resolution, "which was used to treat Plaintiff's 2019 Application as a 'legal nullity,'" so the Board could award her reduced retirement benefits under the 2019 Amendment. *See* (Doc. 66 ¶¶ 9, 30, 155, 157–59, 250–59). Decatur argues that

Count 11 should be dismissed because Plaintiff failed to exhaust her administrative remedies with the EEOC. Plaintiff counters that although the Koehler Resolution was passed more than two years after Plaintiff filed her March 2020 EEOC Charge, this alleged retaliatory conduct could have reasonably been expected to grow out of the facts alleged in her earlier EEOC Charge. (Doc. 85 at 16).

"In order to prove retaliation under Title VII, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." *Gregory v. Georgia Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (cleaned up); *see Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023). "Prior to filing a Title VII action, however, a plaintiff first must file a charge of discrimination with the EEOC." *Gregory*, 355 F.3d at 1279. "The purpose of this exhaustion requirement is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Id.* (cleaned up).

Thus, "a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory*, 355 F.3d at 1280. Ordinarily, this means that "allegations of new acts of discrimination are inappropriate." *Id.* at 1279–80 (citing *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)); However, the Eleventh Circuit has held that "it is unnecessary for a plaintiff to exhaust administrative

remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) (quoting *Gupta v. East Texas State Univ.*, 654 F.2d 411 (5th Cir. 1981)); *Thomas v. Miami Dade Pub. Health Tr.*, 369 F. App'x 19, 23 (11th Cir. 2010); *Fox v. Epay Sys., Inc.*, 2024 WL 901657, at *3 (N.D. Ga. Jan. 16, 2024).

This "*Gupta* Rule" has been understood to mean that if the filing of an EEOC charge leads to retaliation, a plaintiff need not file a second EEOC charge before adding a retaliation claim to pending federal lawsuit regarding the first EEOC charge. *See Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 762 (11th Cir. 1995); *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 892–93 (11th Cir. 2014). However, the continued viability of the *Gupta* Rule is an open question following the Supreme Court's decision in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

In considering whether a charge of discrimination under Title VII was timely filed, the Supreme Court held, "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114. Although the Eleventh Circuit has acknowledged that district courts in this circuit have been divided as to the continued viability of the *Gupta* Rule, it has not yet had occasion to determine *Morgan*'s effect on *Gupta*'s precedential value. *See Ellison v. Postmaster Gen.*,

*United States Postal Serv.*, 2022 WL 4726121, at *8 (11th Cir. Oct. 3, 2022) ("The Court need not decide the effect of the Supreme Court's decision in *Morgan* on the precedential value of *Gupta* and *Baker* to decide this matter . . . .").

Although the continued viability of the *Gupta* Rule is central to the viability of Plaintiff's Title VII retaliation claim, the parties' briefing on this topic is limited. The Court is thus unwilling to dismiss Plaintiff's Title VII claim without receiving more fulsome briefing to aid its decision. Accordingly, Decatur's request for the dismissal of Count 11 is denied, but the parties are expected to more thoroughly brief this issue at summary judgment so the Court may give it proper consideration.

### F.   First Amendment Retaliation (Count 12)

Count 12 alleges that Decatur and Retirement Board members Garrett, Roark, Kanes, and Burge retaliated against Plaintiff's exercise of her first Amendment right to file her EEOC Charge and this lawsuit by "adopting the Koehler Resolution in response to the Charge and lawsuit." (Doc. 66 ¶¶ 260–77).

### 1.   Individuals

The Retirement Board members move to dismiss this claim on legislative immunity grounds. (Doc. 74-1 at 23–25). "Local legislators are entitled to absolute immunity from § 1983 liability for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998). This absolute immunity "attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Id.* (citation omitted).

"Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id*.

Here, the SAC seeks to hold Retirement Board members Garrett, Roark, Kanes, and Burge liable for their votes to enact the May 20, 2022 ordinance known as the Koehler Resolution. (Doc. 66 ¶ 265). But the Supreme Court has held that local legislators' "acts of voting for an ordinance [are], in form, quintessentially legislative." *Bogan*, 523 U.S. at 55. Thus, regardless of these defendants' purported motive, they are entitled to absolute immunity for this legislative act. *See id*. at 54–56. The First Amendment Retaliation claims against these defendants are therefore dismissed.

### 2.    City of Decatur

"The law is clearly established that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005). A "public employer retaliates in violation of the First Amendment when it takes an adverse employment action that is likely to chill the exercise of constitutionally protected speech." *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1377 (11th Cir. 2021) (cleaned up).

Here, Decatur argues that this claim should be dismissed because the Koehler Resolution was not an "adverse employment action" against Plaintiff, the Board lacked a retaliatory motive, and the SAC alleges retaliation through a single act rather than a "widespread practice." *See* (Doc. 73-1 at 17–20).

To start, a single decision by a municipal policymaker can be sufficient to impose liability against a municipality under § 1983. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). But "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481; *see also McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996) ("A municipality may be held liable for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision."). Here, Plaintiff plausibly alleges that the Board is the final decisionmaker regarding the interpretation of the Plan. *See* (Doc. 66 ¶¶ 272, 281); *see also* (Doc. 66-2 at 54) ("The Board will have the power to construe the Plan and to determine all questions arising under the Plan."). The Board's enactment of the Koehler Resolution is therefore plausibly pled as the act of a municipal policymaker, which can impose liability against Decatur under § 1983.

Decatur's other two arguments—(1) that the Koehler Resolution was not an "adverse employment action" and (2) that the Board lacked a discriminatory motive—are too intertwined with developing factual disputes to support dismissal at this stage. Among other things, discovery will provide more information regarding the motives behind the enactment of the Resolution, the Board's processes for considering and enacting ordinances, whether the Board followed those procedures in enacting the Resolution, and whether Decatur has uniformly applied the Resolution or used it to target Plaintiff. Answers to these and other

questions[18] will weigh on the long-term viability of Plaintiff's claim. But when construing all facts and inferences in Plaintiff's favor, the Court concludes that the SAC adequately pleads a claim for First Amendment Retaliation against Decatur, so Decatur's dismissal request must be denied.

### G.    Georgia Whistleblower Retaliation (Count 13)

Count 13 alleges that Decatur violated the Georgia Whistleblower Protection Act ("GWPA"), O.C.G.A. § 45-1-4, when the Retirement Board passed the Koehler Resolution. *See* (Doc. 66 ¶¶ 278–91). Plaintiff alleges that this constitutes an adverse employment action that was meant to deny her full retirement benefits in retaliation for her disclosing violations of law in her EEOC Charge, this lawsuit, and certain communications from her counsel to Decatur and the Retirement Board. *See* (*id.*).

Under the GWPA, "a public employer may not retaliate against a public employee for disclosing 'a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency' . . . ." *Albers v. Georgia*

---

[18] The Court will also be particularly interested in the parties' arguments regarding whether alleged Plaintiff's speech concerned a "matter of public concern," rather than a mere employment grievance. *See, e.g., O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1051 (11th Cir. 2022) ("[I]t is essential to a public employee's free-speech claim that her speech relate to a matter of public concern."); *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1160 (11th Cir. 2015) (cleaned up) ("The First Amendment will step in to safeguard a public employee's right, as a citizen, to participate in discussions involving public affairs, but it will not empower her to constitutionalize the employee grievance.").

*Bd. of Regents of Univ. Sys. of Georgia*, 766 S.E.2d 520, 523 (Ga. Ct. App. 2014) (quoting O.C.G.A. § 45–1–4(d)(2)). To state a claim under the GWPA, "a public employee must establish that (1) she was employed by a public employer; (2) she made a protected disclosure or objection; (3) she suffered an adverse employment action; and (4) there is some causal relationship between the protected activity and the adverse employment action." *Franklin v. Pitts*, 826 S.E.2d 427, 431 (Ga. Ct. App. 2019) (en banc) (cleaned up); *Lamonte v. City of Hampton, Georgia*, 576 F. Supp. 3d 1314, 1318 (N.D. Ga. 2021).[19]

Decatur moves to dismiss this claim on two grounds. First, it argues that the Retirement Board, the specific government entity that passed the Koehler Resolution, is not Plaintiff's "public employer"—Decatur is. *See* (Doc. 73-1 at 21–22). While facts revealed during discovery may ultimately reveal this to be true, the Court is not persuaded at this juncture that The Retirement Board *for the City of*

---

[19] Although the GWPA does not define the phrase "adverse employment action," the Georgia Court of Appeals has explained that "prohibited retaliation includes "the discharge, suspension, or demotion . . . or any other adverse employment action taken by a public employer against a public employee in the terms or conditions of employment." *See Franklin*, 826 S.E.2d at 435 (quoting O.C.G.A. § 45-1-4 (a)(5)). And it has defined the phrase "any other adverse employment action" narrowly—to mean an "employment action analogous to or of a similar kind or class as 'discharge, suspension, or demotion.'" *See Franklin*, 826 S.E.2d at 436; *Byrd v. Gwinnett Cnty. Sch. Dist.*, No. ___ F.Supp.3d ___, 2024 WL 1377644, at *4 (N.D. Ga. Mar. 31, 2024). Although this issue was not raised in the City's Motion, the Court is uncertain that the retaliatory action alleged by the Count 13 will ultimately meet this definition of "adverse employment action."

*Decatur* is a sufficiently separate government entity from the City of Decatur for the purposes of this argument.

Second, Decatur argues that Plaintiff has not sufficiently alleged that her protected activity *caused* any adverse action, relying primarily on the temporal gap between (1) the EEOC Charge and the filing of this lawsuit and (2) the passing of the Koehler Resolution. *See* (Doc. 73-1 at 22–24). But "temporal proximity" between a plaintiff's protected conduct and the adverse employment action "is not the only way a plaintiff may adequately allege causation in support of a GWA retaliation claim; it is merely one way for a court to draw a causal link between protected activities and adverse actions." *Bonds v. Fulton Cnty. Sch. Dist.*, 2023 WL 11915707, at *7 (N.D. Ga. Apr. 28, 2023) (citing *Forrester v. Georgia Dep't of Hum. Servs.*, 708 S.E.2d 660, 668–69 (Ga. Ct. App. 2011)); *see also Albers*, 766 S.E.2d at 524 ("[A] retaliation claim fails '[i]f there is a substantial delay between the protected expression and the adverse action *in the absence of other evidence tending to show causation*.") (emphasis added). Moreover, a plaintiff's burden to establish causation under the GWA "is not high"—"Georgia courts have explained that '[t]he causal link element is construed *broadly* so that a plaintiff *merely* has to prove that the protected activity and the negative employment action *are not completely unrelated*.'" *Lamonte v. City of Hampton, Georgia*, 576 F. Supp. 3d 1314, 1321 (N.D. Ga. 2021) (quoting *Baptiste v. Mann*, 861 S.E.2d 212, 219 (Ga. Ct. App. 2021)) (emphasis added by *Lamonte*).

Although plaintiff must develop causation evidence during discovery, at this stage, the SAC sufficiently alleges that the alleged retaliatory conduct is "not completely unrelated" to Plaintiff's protected activity. The Court thus denies Decatur's request to dismiss Count 13.

### H.   Declaratory Judgment (Count 14)

Count 14 seeks a declaratory judgment that Decatur never validly adopted the 2019 Amendment because the City Commissioners failed to place their individual signatures on the ordinance purporting to enact the amendment or any other document otherwise memorializing the amendment. *See* (Doc. 66 ¶¶ 292–94). As alleged in the SAC, "Section 8.1 of the Plan—as it existed at the time of the attempted 2019 Amendment—enumerates the procedure for amending the Plan . . . . The final step of this procedure states: 'The City Commissioners then in office will adopt each amendment by placing *their signatures* thereon.'" (Doc. 66 ¶ 85) (citing Doc. 66-1 at 44) (emphasis added). Plaintiff claims that because only the City Clerk and the Mayor signed the enacting ordinance, the 2019 Amendment is null and void. *See* (Doc. 66 at ¶ 86).

Decatur moves to dismiss this claim because, in its view, it is enough that the Mayor, who is a member of the Board of Commissioners, signed the ordinance. *See* (Doc. 73-1 at 24). It further argues that, under Georgia contract law, any ambiguity in whether the Section 8.1's requirements were satisfied should be resolved in favor of upholding the validity of the 2019 Amendment. *See* (*id.* at 24–25).

"[C]ontract construction is a question of law for the court, unless, after applying the rules of contract interpretation, an uncertainty still remains as to which of two or more possible meanings represents the parties' true intentions." *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1321 (N.D. Ga. 2014) (quoting *Eells v. State Farm Mut. Auto. Ins. Co.*, 752 S.E.2d 70, 74 (Ga. Ct. App. 2013)). The court first "looks to the four corners of the agreement to ascertain the meaning of the contract from the language employed." *Mehic v. Allstate Prop. & Cas. Ins. Co.*, 587 F. Supp. 3d 1327, 1332 (N.D. Ga. 2022) (citing *Brogdon v. Pro Futures Bridge Cap. Fund, L.P.*, 580 S.E.2d 303, 306 (Ga. Ct. App. 2003)). "Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity." *Mehic*, 587 F. Supp. 3d at 1331 (quoting *Envision Printing, LLC v. Evans*, 786 S.E.2d 250, 252 (Ga. Ct. App. 2016)). "To that end, "[t]he cardinal rule of construction is to ascertain the intention of the parties.'" *Mehic*, 587 F. Supp. 3d at 1331 (quoting O.C.G.A. § 13-2-3). "Ambiguity exists when a contract contains an uncertain meaning, is duplicitous, and indistinct, or when a word or phrase may be fairly understood in more than one way." *Snipes v. Marcene P. Powell & Assocs., Inc.*, 616 S.E.2d 152, 155 (Ga. Ct. App. 2005).

Here, it is at best ambiguous whether the relevant Plan provisions support Decatur's position. For the purposes of Decatur's Motion, the Court cannot say that the signature of one City Commissioner (the Mayor) ensures the 2019 Amendment's validity, where Section 8.1 dictates that the City Commissioners will

adopt an amendment by affixing "their signatures" to it. *See* (Doc. 66-1 at 44). Because Court cannot adopt Decatur's interpretation at this juncture, its request for the dismissal of Count 14 is denied.

## V.    Conclusion

For the foregoing reasons, the Motions filed by Defendants Connie Jacobs-Walton, Andrea Arnold, Chet Burge, Patricia Garrett, Panos Kanes, and Meredith Roark, [Docs. 71, 72, 74], are **GRANTED** and they are **DISMISSED** from this case. The City of Decatur's Motion, [Doc. 73], is **GRANTED IN PART AND DENIED IN PART**. Counts 4, 5, and 6, against the City of Decatur are **DISMISSED**. Counts 1, 2, 3, 9, 10, 11, 12, 13, and 14 against the City of Decatur will proceed.

The Court believes that the parties' experienced counsel are equipped to reach a negotiated resolution of this long-running dispute. This case is accordingly **REFERRED** to the Chief Magistrate Judge for assignment to the next available magistrate judge for mediation. The parties are **DIRECTED** to notify the Court of the status of the case within **three days** after the conclusion of the mediation. The Court **ADVISES** the parties that the mediation will be conducted in person, not by video or teleconference. In advance of mediation, the parties are **DIRECTED** to meet and confer in good faith to attempt to resolve this matter.

In the meantime, the case will continue to move forward. The parties are **ORDERED** to file a joint proposed scheduling order by **October 21, 2024**.

**IT IS SO ORDERED** this 30th day of September, 2024.

_____
**Honorable Amy Totenberg**
**United States District Judge**